UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FRANK ENWONWU,  )  <br>         Petitioner,  )  <br>                       )   Civil Action 05-11666-WGY <br> v.                  )  <br>                       )  <br> MICAHEL CHERTOFF,     )  <br> BRUCE CHADBOURNE,     )  <br> HOMELAND SECURITY, and )  <br> THOMAS HODGESON,      )  <br>         Respondents.  )  | |

**RESPONDENTS, MICHAEL CHERTOFF, BRUCE CHADBOURNE AND THE DEPARTMENT OF HOMELAND SECURITY'S, NOTICE OF SUPPLEMENTAL AUTHORITY**

On August 8, 2005, Frank Enwonwu ("Enwonwu") filed the instant petition for writ of habeas corpus seeking release from "unlawful detention, without any provision for release on BOND or any form of conditional release, pending the resolution of his case currently pending in the United States Court of Appeals (First Circuit)." Petition, p. 1. Enwonwu alleges, *inter alia*, that his continued detention violates the substantive due process clause in that his continued detention and/or removal would constitute a "state created danger."

On August 29, 2005, the Third Circuit Court of Appeals issued its opinion in <u>Kamara v. Attorney General</u>, --- F.3d ---, 2005 WL 2063873 (3rd

Cir. 2005) (attached). In that case, the Third Circuit concluded that the theory of state created danger has no application in the removal context.

> We . . . . hold that the state-created danger exception has no place in our immigration jurisprudence. . . . Extending the state-created danger exception to final orders of removal would impermissibly tread upon the Congress' virtually exclusive domain over immigration, and would unduly expand the contours of our immigration statutes and regulations, including the regulations implementing the CAT. Despite the fact that Congress could reasonably choose to amend the immigration statutes to incorporate novel developments in our case law, these are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress.

Id., at *11-12. (quotations and citations omitted).

                          Respectfully Submitted,
                          MICHAEL J. SULLIVAN
                          United States Attorney

                          /s/ Mark J. Grady
                          MARK J. GRADY
                          Assistant U.S. Attorney
                          U.S. Attorney's Office
                          John Joseph Moakley U.S. Courthouse
                          1 Courthouse Way, Suite 9200
                          Boston, MA   02210
                          Tel. No. (617) 748-3136

                      Certificate of Service

     I hereby certify that a copy of the foregoing was served upon Petitioner this 8th day of September 2005 via first class mail.

                          /s/ Mark J. Grady
                          Mark J. Grady

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2063873
--- F.3d ----, 2005 WL 2063873 (3rd Cir.(Pa.))
**(Cite as: 2005 WL 2063873 (3rd Cir.(Pa.)))**
<KeyCite History>

Briefs and Other Related Documents

Only the Westlaw citation is currently available.

United States Court of Appeals,
Third Circuit.
Mohamed **KAMARA**
v.
ATTORNEY GENERAL OF THE UNITED STATES, [FN*] Appellant.
No. 04-2647.

Argued May 9, 2005.
Aug. 29, 2005.

Background: Alien petitioned for writ of habeas corpus after he was denied relief under Convention Against Torture (CAT) by Board of Immigration Appeals (BIA). The United States District Court for the Middle District of Pennsylvania, Malcolm Muir, J., granted petition and permanently enjoined government from deporting alien to Sierra Leone. Department of Homeland Security (DHS) appealed.

Holdings: The Court of Appeals, Sloviter, Circuit Judge, held that:
 (1) claims raised in habeas petition had to be addressed by Court of Appeals as if they were presented in first instance as a petition for review in light of intervening passage of REAL ID Act;
 (2) BIA's decision satisfied alien's due process right to individualized determination;
 (3) to establish eligibility for relief under CAT, alien had to establish only that it was more likely than not that, if removed to Sierra Leone, he faced torture by either Sierra Leone government or military rebel force when two entities were considered together;
 (4) remand to BIA for determination of alien's eligibility for relief under CAT was warranted; and
 (5) state-created danger exception did not apply in immigration context.
 Vacated and remanded.

[1] Aliens k54.3(1)

24k54.3(1)
In light of intervening passage of REAL ID Act, which eliminated district courts' habeas corpus jurisdiction over final orders of removal in almost all cases, but restored judicial review of constitutional claims and questions of law via petitions for review, Court of Appeals had to vacate and disregard district court's opinion on alien's petition for writ of habeas corpus, which was pending on appeal when Act was passed, and address claims raised in habeas petition as if they were presented before Court of Appeals in the first instance as petition for review. Immigration and Nationality Act, § 242(a)(2)(D), as amended, 8 U.S.C.A. § 1252(a)(2)(D).

[1] Habeas Corpus k282
197k282
In light of intervening passage of REAL ID Act, which eliminated district courts' habeas corpus jurisdiction over final orders of removal in almost all cases, but restored judicial review of constitutional claims and questions of law via petitions for review, Court of Appeals had to vacate and disregard district court's opinion on alien's petition for writ of habeas corpus, which was pending on appeal when Act was passed, and address claims raised in habeas petition as if they were presented before Court of Appeals in the first instance as petition for review. Immigration and Nationality Act, § 242(a)(2)(D), as amended, 8 U.S.C.A. § 1252(a)(2)(D).

[2] Aliens k54.3(2.1)
24k54.3(2.1)
Standard of review by Court of Appeals remained the same after government's appeal of district court's decision granting alien's petition for writ of habeas corpus was converted into petition for review pursuant to REAL ID Act. Immigration and Nationality Act, § 242(a)(2)(D), as amended, 8 U.S.C.A. § 1252(a)(2)(D).

[3] Aliens k54.3(4)
24k54.3(4)
On petition for review of decision of Board of Immigration Appeals (BIA), Court of Appeals is limited to pure questions of law and to issues of application of law to fact, where the facts are undisputed and not the subject of challenge.

[4] Aliens k54.3(4)
24k54.3(4)
On petition for review of decision of Board of Immigration Appeals (BIA), Court of Appeals reviews legal decisions de novo, but will afford *Chevron* deference to BIA's reasonable interpretations of statutes which it is charged with administering.

[4] Statutes k219(5)
361k219(5)
On petition for review of decision of Board of Immigration Appeals (BIA), Court of Appeals reviews legal decisions de novo, but will afford *Chevron* deference to BIA's reasonable interpretations of statutes which it is charged with administering.

[5] Aliens k54(5)
24k54(5)
Board of Immigration Appeals (BIA) decision in alien's case contained sufficient indicia that BIA undertook individualized determination of alien's eligibility for relief under Convention Against Torture (CAT), and thus satisfied due process, given that decision described in detail CAT petition submitted by alien, procedural posture of case, basis for immigration judge's (IJ) decision, and relevant statutes and regulations. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231.

[5] Constitutional Law k274.3
92k274.3
Board of Immigration Appeals (BIA) decision in alien's case contained sufficient indicia that BIA undertook individualized determination of alien's eligibility for relief under Convention Against Torture (CAT), and thus satisfied due process, given that decision described in detail CAT petition submitted by alien, procedural posture of case, basis for immigration judge's (IJ) decision, and relevant statutes and regulations. U.S.C.A. Const.Amend. 5; Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231.

[6] Constitutional Law k274.3
92k274.3
Aliens facing removal are entitled to due process. U.S.C.A. Const.Amend. 5.

[7] Constitutional Law k274.3

92k274.3
Under due process principles, in the administrative context, an alien (1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her, (2) must be allowed to make arguments on his or her own behalf, and (3) has the right to an individualized determination of his or her interests. U.S.C.A. Const.Amend. 5.

[8] Constitutional Law k274.3
92k274.3
In the context of alien's due process right to individualized determination of removal status, question is not whether Board of Immigration Appeals (BIA) reached the correct decision but rather is simply whether BIA made an individualized determination of alien's interest, and BIA's decision need only provide sufficient indicia that such a determination was made. U.S.C.A. Const.Amend. 5.

[9] Aliens k54.1(2)
24k54.1(2)

[9] Aliens k54.3(3)
24k54.3(3)
Agency action is entitled to a presumption of regularity, and it is burden of alien asserting due process claim based on alleged lack of individualized decision to show that Board of Immigration Appeals (BIA) did not review the record when it considered appeal. U.S.C.A. Const.Amend. 5.

[10] Aliens k54(5)
24k54(5)
Although its decision might not have been model of exposition, decision of Board of Immigration Appeals (BIA) addressing alien's eligibility for relief under Convention Against Torture (CAT) sufficiently set forth BIA's reasoning in manner that permitted reviewing court to discern basis of its decision, and thus satisfied requirements of Administrative Procedure Act (APA). 5 U.S.C.A. § 551 et seq.; Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231.

[11] Administrative Law and Procedure k507
15Ak507
Under Administrative Procedure Act (APA), agency need only set forth the basis of its administrative action with such clarity as to be understandable; it need not provide a detailed statement of its reasoning and conclusions. 5 U.S.C.A. § 551 et seq.

[12] Aliens k53.10(3)
24k53.10(3)
An applicant for relief on the merits under Convention Against Torture (CAT) bears the burden of establishing that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. § 208.16(c)(2).

[12] Treaties k8
385k8
An applicant for relief on the merits under Convention Against Torture (CAT) bears the burden of establishing that it is more likely than not that he or she would be tortured if removed to the proposed country of removal. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. § 208.16(c)(2).

[13] Aliens k53.10(3)
24k53.10(3)
Standard for relief under the Convention Against Torture (CAT) has no subjective component, but instead requires alien to establish, by objective evidence, that he is entitled to relief. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231.

[13] Treaties k8
385k8
Standard for relief under the Convention Against Torture (CAT) has no subjective component, but instead requires alien to establish, by objective evidence, that he is entitled to relief. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231.

[14] Aliens k54.1(4.1)
24k54.1(4.1)
Alien's testimony in support of claim for relief under Convention Against Torture (CAT), if credible, may be sufficient to sustain the burden of proof without corroboration. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231.

[15] Aliens k53.10(3)
24k53.10(3)
If an alien meets his or her burden of proof on claim for relief under Convention Against Torture (CAT), withholding of removal under CAT is mandatory, just as it is for withholding of deportation. Immigration and Nationality Act, §§ 241, 243(h), as amended, 8 U.S.C.A. §§ 1231, 1253(h).

[16] Aliens k53.10(3)
24k53.10(3)
To establish eligibility for relief under Convention Against Torture (CAT), alien had to establish only that it was more likely than not that, if removed to Sierra Leone, he faced torture by either Sierra Leone government or military rebel force assumed to qualify as "public official" when two entities were considered together, in that alien was entitled to CAT protection if able to demonstrate that cumulative probability of torture by those two entities exceeded 50 percent; he was not required to show greater than 50 percent probability that he would face torture at hands of either entity, considered separately. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. §§ 208.16(c)(3), 208.18(a) 1208.16(c)(3)(ii).

[16] Treaties k8
385k8
To establish eligibility for relief under Convention Against Torture (CAT), alien had to establish only that it was more likely than not that, if removed to Sierra Leone, he faced torture by either Sierra Leone government or military rebel force assumed to qualify as "public official" when two entities were considered together, in that alien was entitled to CAT protection if able to demonstrate that cumulative probability of torture by those two entities exceeded 50 percent; he was not required to show greater than 50 percent probability that he would face torture at hands of either entity, considered separately. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. §§ 208.16(c)(3), 208.18(a) 1208.16(c)(3)(ii).

[17] Aliens k53.10(3)
24k53.10(3)

[17] Aliens k54.3(6)
24k54.3(6)
Remand to Board of Immigration Appeals (BIA) for determination of alien's eligibility for relief under Convention Against Torture (CAT) was warranted when BIA erroneously required alien to show greater than 50 percent probability that, if removed to Sierra Leone, he would face torture at hands of either Sierra Leone government or military rebel force, considered separately, and declined to reach issue of whether rebel force qualified as "public official" under CAT. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. §§ 208.16(c)(3), 208.18(a), 1208.16(c)(3)(ii).

[17] Treaties k8
385k8

Remand to Board of Immigration Appeals (BIA) for determination of alien's eligibility for relief under Convention Against Torture (CAT) was warranted when BIA erroneously required alien to show greater than 50 percent probability that, if removed to Sierra Leone, he would face torture at hands of either Sierra Leone government or military rebel force, considered separately, and declined to reach issue of whether rebel force qualified as "public official" under CAT. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. §§ 208.16(c)(3), 208.18(a), 1208.16(c)(3)(ii).

[18] Habeas Corpus k207
197k207
Writ of habeas corpus performs a precise and specific function: it forces the government to justify a decision to hold an individual in custody.

[19] Aliens k54(5)
24k54(5)
State-created danger exception, imposing due process duty on government to protect person against injuries inflicted by third party when government affirmatively placed person in position of danger he would not otherwise have faced, did not apply in immigration context, precluding alien's claim that Board of Immigration Appeals (BIA), in issuing final order of removal, violated alien's right to substantive due process under exception. U.S.C.A. Const.Amend. 14.

[19] Constitutional Law k274.3
92k274.3
State-created danger exception, imposing due process duty on government to protect person against injuries inflicted by third party when government affirmatively placed person in position of danger he would not otherwise have faced, did not apply in immigration context, precluding alien's claim that Board of Immigration Appeals (BIA), in issuing final order of removal, violated alien's right to substantive due process under exception. U.S.C.A. Const.Amend. 14.

[20] Constitutional Law k252
92k252
The Due Process Clause of the Fourteenth Amendment applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent. U.S.C.A. Const.Amend. 14.

[21] Constitutional Law k253(1)
92k253(1)
In most circumstances, the Due Process Clause imposes no obligation on a state to protect an individual from harm inflicted by private parties, but under state-created danger exception, government has a constitutional duty to protect a person against injuries inflicted by a third party when it affirmatively places the person in a position of danger the person would not otherwise have faced. U.S.C.A. Const.Amend. 14.

[22] Aliens k53.10(3)
24k53.10(3)

[22] Aliens k54.3(6)
24k54.3(6)
Orders granting permanent injunction against removal based on alien's eligibility for relief under Convention Against Torture (CAT) are overbroad, inasmuch as regulations governing CAT relief establish that protection under CAT may be terminated upon changes in country conditions, and therefore government is authorized to file motion to reopen, after CAT relief is granted, to terminate alien's deferral of removal. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. § 208.17(d).

[22] Treaties k8
385k8

Orders granting permanent injunction against removal based on alien's eligibility for relief under Convention Against Torture (CAT) are overbroad, inasmuch as regulations governing CAT relief establish that protection under CAT may be terminated upon changes in country conditions, and therefore government is authorized to file motion to reopen, after CAT relief is granted, to terminate alien's deferral of removal. Immigration and Nationality Act, § 241, as amended, 8 U.S.C.A. § 1231; 8 C.F.R. § 208.17(d).

Peter D. Keisler, Assistant Attorney General, Donald E. Keener, Deputy Director, Alison R. Drucker (Argued), Senior Litigation Counsel, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for Appellant.

James V. Wade, Federal Public Defender, Ronald A. Krauss (Argued), Assistant Federal Public Defender, Office of Federal Public Defender, Harrisburg, PA, for Appellee.

Before SLOVITER and FISHER, Circuit Judges, and POLLAK, [FN**] District Judge.

OPINION OF THE COURT

SLOVITER, Circuit Judge.

**\*1** The Department of Homeland Security ("DHS") appeals the Order of the District Court granting Mohamed Kamara's petition for writ of habeas corpus and permanently enjoining the government from deporting Kamara to Sierra Leone.

I.
Facts and Proceedings

The parties stipulated in a joint motion, filed on April 13, 2004, to the following facts: [FN1] Kamara, a native of Sierra Leone, was studying medicine in Cuba in the early 1980s on a grant from the government of Sierra Leone. In the course of his studies in Cuba, the Sierra Leone government failed to provide the financial support it had promised. In response, Kamara and other Sierra Leone students stormed the Sierra Leone embassy in Cuba, physically accosted the Sierra Leonian Ambassador, and publicly accused the Sierra Leone government of corruption. Shortly thereafter, in 1982, Kamara was "deported" (expelled) from Cuba at the direction of officials of the Sierra Leone government, and required to return to Sierra Leone. While in transit through Miami, Florida on a non-immigrant transit visa, Kamara left the airport. He has remained in the United States ever since.

On April 23, 1999, Kamara was convicted in a New York State Court of attempted sale of a controlled substance (cocaine) in the third degree, and sentenced to six months incarceration. The conviction arose after undercover police officers approached Kamara and offered him $10 to help them buy cocaine. Kamara, who lived in a drug infested area, complied with the request and was thereafter arrested. On June 18, 1999, the Immigration and Naturalization Service ("INS") (which has since been replaced by the Department of Homeland Security, Bureau of Immigration and Customs Enforcement) commenced removal proceedings against Kamara on the grounds that he was an alien convicted of an aggravated felony as defined in 8 U.S.C. § 1101(a)(43)(U), an alien convicted of violating a controlled substance law, and an alien who remained in the United States for a time longer than permitted. *See* 8 U.S.C. § 1227(a)(2)(A)(iii), (a)(2)(B)(i), (a)(1)(B).

Kamara applied for asylum, withholding of removal under § 241(b)(3) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1231(b)(3), and for protection under the CAT. [FN2] On February 25, 2000, the Immigration Judge ("IJ") issued an oral opinion granting Kamara's application for withholding of removal, reasoning that "in this case the widespread atrocities against people opposing the authority of the former government and present military rebel forces [the Revolutionary United Front ('RUF') ] indicates a

greater chance, rather than a lesser chance that the respondent will be persecuted for who he is upon his return." Supp.App. at 21. In the same oral decision, the IJ pretermitted Kamara's application for asylum, *see* 8 U.S.C. § 1158(b)(2)(A)(ii), (b)(2)(B)(i) (providing that an alien convicted of aggravated felony is not eligible for asylum), and held that given its decision to grant Kamara's petition for withholding of removal, it was unnecessary to reach the CAT claim.

**\*2** On October 31, 2000, the Bureau of Immigration Appeals ("BIA" or "Board") reversed the decision of the IJ, stating that there is "insufficient evidence in the record to suggest that anyone in Sierra Leone would want to persecute [Kamara] for any complaints he made while a student in Cuba over 20 years ago." J.A. at 19. The case was remanded to the IJ for consideration of whether Kamara was entitled to relief under the CAT.

At an evidentiary hearing held on January 19, 2001, the IJ heard additional testimony from Kamara, received testimony from Kamara's niece, and accepted into evidence information about country conditions in Sierra Leone. The IJ found both Kamara and his niece credible, and thereafter, in a written opinion dated July 12, 2001, accepted their testimony as the facts of the case.

The testimonial and other evidence regarding country conditions revealed that as of January 2001, Sierra Leone was in the midst of a civil war. The RUF controlled two thirds of the country, and the government controlled the remaining one third. Each entity had an established record of grievous human rights violations.

The several country reports and various media publications (New York Times, Time Magazine, USA Today) received by the IJ made plain that "[t]here is hardly a ruling body in the world ... that matches the RUF and its allied forces for its utter inhumanity to people under its control." J.A. at 26. The IJ, continuing reference to the country reports, stated that the rebel group, which was the military branch of the Sierra Leone government before the revolution, has killed thousands of unarmed civilians, including women and children (many during mass executions), and maimed countless others through its " 'particularly vicious practice of cutting off ears, noses, hands, arms, and legs of noncombatants as a deliberate terror tactic ...' " J.A. at 26-27 (quoting 1999 Country Report). Women were systematically raped by members of the rebel group, and men who refused to rape their own family members had limbs amputated. The IJ found that "the RUF carried out a pattern of abducting those from the outside who demonstrated any special capabilities: 'Rebel forces abducted civilians, missionaries, aid workers from nongovernmental agencies, U.N. personnel, and journalists.' " J.A. at 27 (quoting 1999 Country Report). Likewise, they deliberately targeted and murdered " 'government officials, human rights activists, religious leaders, and lawyers as they entered Freetown.' " J.A. at 27 (quoting 1999 Country Report).

The Sierra Leone government, though clearly not as brutal as the RUF, also had "serious problems" reflected in its human rights record. J.A. at 29. The 1999 Country Report recounts incidents of extrajudicial killings, summary executions of suspected rebels and suspected rebel collaborators, beatings of noncombatants, as well as arbitrary arrest and detention of persons. Furthermore, "discrimination based on ethnic origin [was] widely practiced...." J.A. at 29.

**\*3** As an initial matter, the IJ determined that akin to the Taliban in Afghanistan and the Israeli Defense Forces in Palestinian Lands, the RUF should be considered a "political official" (or "government") for purposes of the CAT, and therefore that Kamara's claim for protection against torture by the RUF should be heard on the merits. *See* 8 C.F.R. § 208.18(a)(1) (stating that to receive protection under CAT, applicant must show that torture will be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity"). The IJ then concluded that based on the testimony of Kamara and his niece, and the "ample evidence of gross, flagrant, or mass violations of human rights in Sierra Leone ... it is more likely than not that respondent will be tortured if returned to Sierra Leone today." J.A. at 30 (internal citation and quotations omitted).

The IJ reasoned that "[i]f the respondent should fall into the RUF's hands, torture is all but certain." J.A. at 28. Kamara's family had already suffered a great deal at the hands of the RUF. The family home was burned down, Kamara's cousin had his hands chopped off, his aunt was shot, the same aunt's husband died while trapped in a house that was set on fire by the RUF, and Kamara's brother-in-law, who has since died, had many properties destroyed, including the Muslim school that he founded. Kamara's mother, sister, and aunt joined the "more than 1 million citizens" who fled the country or were internally displaced. J.A. at 27.

The IJ, reiterating his findings following the first hearing, also found that the relevant facts made "reasonable and altogether plausible [Kamara's] concern that he will be singled out by the government for abusive treatment in violation of his personal security if he is deported there" because of his prior protests in Cuba twenty years before. J.A. at 29. The IJ noted additionally that Kamara will be highly noticeable "because of his long absence from the country coupled with his being among the small minority of elites in the country [which is only 20% literate] (by reason of education, family background, wealth, and experience abroad)." J.A. at 30.

Balancing the very "real" probability that Kamara may fall into RUF hands (and the "certain" torture that would result) with the "nearly certain" probability that Kamara will fall into the government's hands, (and the "reasonable" chance of "abusive treatment in violation of his personal security" that would result), the IJ found that Kamara's application for relief under the CAT should be granted. J.A. at 28-29. Given the additional fact finding, the IJ also clarified the facts surrounding Kamara's petition for withholding of removal, in the event that the BIA decided to revisit the issue on appeal. *See* 8 U.S.C. § 1231(b)(3). The IJ noted, however, that the BIA's law of the case precluded him from granting withholding of removal at that stage in the proceedings.

**\*4** The INS once again appealed the decision of the IJ, and on April 5, 2002, in a six paragraph decision, the BIA sustained the appeal. The Board first reasoned that, given the IJ's findings that "it cannot be found to be more likely than not that [the respondent] would find himself in the RUF's hands," there was no reason to discuss the likelihood of torture by the RUF or whether the RUF constitutes a government for purposes of the CAT. J.A. at 37. The BIA then concluded that Kamara failed to meet his burden of proof that he would face "torture" at the hands of the Sierra Leone government. J.A. at 37- 38 (stating that " 'abusive-treatment' violative of one's 'personal security' does not constitute torture, as defined by the regulations") (citing 8 C.F.R. § 208.18(a)).

On April 23, 2002, Kamara filed a petition for a writ of habeas corpus in the Middle District of Pennsylvania, challenging the decision of the BIA. [FN3] The District Court granted the writ, holding that "[t]he cursory and erroneous review of this case by the [BIA] violated Kamara's right to due process of law," and that "[w]hen the [CAT] regulations are properly construed, the undisputed evidence was sufficient to meet the requirements for relief." J.A. at 70-71. The Court also held that deporting Kamara to Sierra Leone would violate Kamara's substantive due process rights under the "state-created danger" exception. *See, e.g., Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996). Finally, the Court issued a permanent injunction against removal. DHS filed a timely notice of appeal on June 9, 2004.

II.
Jurisdiction / Standard of Review

A. *Jurisdiction*

[1] Until May 11 of this year, an alien convicted of an aggravated felony and removable on such grounds was statutorily barred from filing a petition for review in the court of appeals challenging the BIA's finding that s/he was ineligible for relief under the CAT. *See* 8 U.S.C. § 1252(a)(2)(C); *see also Bakhtriger v. Elwood,* 360 F.3d 414, 420 (3d Cir.2004); *Patel v. Ashcroft,* 294 F.3d 465, 468 (3d Cir.2002). We held in *Ogbudimkpa,* however, that a district court retains jurisdiction to consider claims alleging violations of the CAT raised in a habeas corpus petition. 342 F.3d at 222; *see also* 28 U.S.C. § 2241.

This jurisdictional framework was radically overhauled on May 11, 2005, with the passage of the REAL ID Act of 2005, Pub.L. No. 109-13, 119 Stat. 231. The provision relevant to this appeal, Section 106(a) of the Act, amends 8 U.S.C. § 1252(a)(2) to eliminate the district courts' habeas corpus jurisdiction (28 U.S.C. §§ 2241, 1361, and 1651) over final orders of removal in nearly all cases. [FN4] Section 106(a)(1)(B) provides that:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e) of this section.

**\*5** REAL ID Act § 106(a)(1)(B); 8 U.S.C. § 1252(a)(4). Section 106(a)(1)(A)(iii) of the Act, however, amends 8 U.S.C. § 1252 by adding a new provision, § 1252(a)(2)(D), which states that:

> Nothing in subparagraph (B) or (C), or in any other provision of this Act (other than this section) which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review filed with an appropriate court of appeals in accordance with this section.

8 U.S.C. § 1252(a)(2)(D). With this amendment,

> Congress evidenced its intent to restore judicial review of constitutional claims and questions of law presented in petitions for review of final removal orders. This now permits all aliens, including criminal aliens, to obtain review of constitutional claims and questions of law upon filing of a petition for review with an appropriate court of appeals.

*Papageorgiou v. Gonzales,* 413 F.3d 356, 358 (3d Cir.2005); *see also Fernandez-Ruiz v. Gonzales,* 410 F.3d 585 (9th Cir.2005).

Congress explicitly made the above amendments retroactive. REAL ID Act § 106(b) provides that § 1252(a)(2)(D), "shall take effect upon the date of the enactment of this division and shall apply to cases in which the final administrative order of removal ... was issued before, on, or after the date of the enactment of this division." *See also Papageorgiou,* 413 F.3d at 358.

Furthermore, habeas petitions filed under 28 U.S.C. § 2241, which as of May 11, 2005, were pending in the district courts, shall be transferred to

> the court of appeals for the circuit in which a petition for review could have been properly filed under section 242(b)(2) of the Immigration and Nationality Act (8 U.S.C. § 1252), as amended by this section.... The court of appeals shall treat the transferred case as if it had been filed pursuant to a petition for review under such section 242, except that subsection (b)(1) of such section [relating to the 30-day filing deadline] shall not apply.

REAL ID Act § 106(c).

The REAL ID Act is silent as to the exact procedural posture which faces us here, *i.e.,* an appeal from a district court's habeas decision that is now pending before the court of appeals. Nonetheless, as explained in *Bonhometre v. Gonzales,* 414 F.3d 442 (3d Cir.2005),

> Despite this silence, it is readily apparent, given Congress' clear intent to have all challenges to removal orders heard in a single forum (the court of appeals), [H.R. Conf. Rep. No. 109-72] at 174 [ (2005) ], that those habeas petitions that were pending before this Court on the effective date of the REAL ID Act are properly converted to petitions for review and retained by this Court.

*Id.* at 445. To dismiss the present case would be arbitrary (by treating habeas petitions which are pending resolution in the district courts differently than habeas petitions where a decision has already been rendered, in many cases in favor of the alien) and is inconsistent with Congress' express intent to provide aliens with one chance for judicial review in the court of appeals. *See* H.R. Conf. Rep. No. 109-72, at 174-76 (2005); *cf. Sorrells v. United States,* 287 U.S. 435, 450, 53 S.Ct. 210, 77 L.Ed. 413 (1932) ("To construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose, is, as we have seen, a traditional and appropriate function of the courts.").

**\*6** Thus, in light of the peculiar procedural posture of the present case, and the intervening passage of the REAL ID Act, we are obliged to vacate and disregard the District Court's opinion and address the claims raised in Kamara's habeas petition as if they were presented before us in the first instance as a petition for review. *Bonhometre,* 414 F.3d 442, 445.

B. *Scope of Review*

[2] Although DHS's appeal of the District Court's decision granting Kamara's habeas corpus petition has now been converted into a petition for review, our standard of review remains the same. *Bonhometre,* 414 F.3d 442, 445. A review for "constitutional claims or questions of law," as described in § 106(a)(1)(A)(iii) of the REAL ID Act, 8 U.S.C. § 1252(a)(2)(D), mirrors our previously enunciated standard of review over an alien's habeas petition. *See Bakhtriger,* 360 F.3d at 425 ("In the wake of [*INS v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ], we are not aware of any cases that have upheld habeas review of factual findings or discretionary determinations in criminal alien removal cases. Rather, all circuits to decide the issue have limited criminal alien habeas petitions to constitutional challenges or errors of law."). [FN5]

[3][4] Thus, examining each of Kamara's present claims, we are limited to "pure questions of law," *St. Cyr,* 533 U.S. at 305, 121 S.Ct. 2271, and to "issues of application of law to fact, where the facts are undisputed and not the subject of challenge." *Bakhtriger,* 360 F.3d at 420 (citing *Ogbudimkpa,* 342 F.3d at 222). We review the BIA's legal decisions *de novo, Wang v. Ashcroft,* 368 F.3d 347, 349 (3d Cir.2004), but will afford *Chevron* deference to the BIA's reasonable interpretations of statutes which it is charged with administering. *INS v. Aguirre-Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999); *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

III.
Discussion
A. *The BIA's Review of the IJ's Decision*

[5] Kamara argues that the BIA violated his due process right to meaningful review by engaging in a cursory evaluation of the IJ's evidentiary findings and legal conclusions, and by issuing an inadequate opinion. Specifically, he contends that the BIA's opinion consisted of only six paragraphs, with no adequate analysis or discussion, and that it relied on an irrelevant section of the IJ's written decision having nothing to do with the CAT claim.

[6][7] Aliens facing removal are entitled to due process. *See Sewak v. INS,* 900 F.2d 667, 671 (3d Cir.1990). In the administrative context, an alien: "(1) is entitled to factfinding based on a record produced before the decisionmaker and disclosed to him or her, (2) must be allowed to make

arguments on his or her own behalf ...; and (3) has the right to an individualized determination of his [or her] interests." *Abdulai v. Ashcroft,* 239 F.3d 542, 549 (3d Cir.2001) (internal quotations and citations omitted). Kamara does not contend that the decision to remove him was based on evidence kept secret from him or that he was prevented from making his case to the BIA or IJ. Thus, the only due process right potentially implicated in this case is the right to an individualized determination.

**\*7** [8][9] As stated in *Abdulai,* "the question for due process purposes is not whether the BIA reached the *correct* decision; rather it is simply whether the Board made an individualized determination of [the alien's] interest...." 239 F.3d at 550 (emphasis in original). The Board's decision need only provide "sufficient indicia" that such a determination was made. *Id.* ("[o]ne can deduce that the BIA was aware that Abdulai was a Nigerian seeking asylum on the basis of political persecution, that there had been issues involving a change in the Nigerian government and his failure to document his membership in a political party, and that the IJ's decision evinced dissatisfaction with his meeting the requisite burden of proof. This is sufficient."). Agency action is entitled to a presumption of regularity, and it is the petitioner's burden to show that the BIA did not review the record when it considered the appeal. *Id.* at 550-51.

The BIA's decision in the present case contains more than "sufficient indicia" that it undertook an individualized determination. It describes in detail the CAT petition submitted by Kamara, the procedural posture of the case, the basis for the IJ's decision, and the relevant statutes and regulations.

We find no support for Kamara's contention that the BIA erroneously relied on the IJ's statement, made in a section of the IJ's decision discussing Kamara's withholding of removal claim, that "it cannot be found to be more likely than not that [Kamara] would find himself in the RUF's hands...." J.A. at 34. Despite the fact that a claim for relief under the CAT and a petition for withholding of removal require different elements of proof, the chance of falling into the RUF's hands is the same regardless of which claim the BIA is evaluating. [FN6]

[10][11] We also find that the BIA's decision satisfies the requirements of the Administrative Procedure Act. As stated in *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), an agency need only set forth the basis of its administrative action "with such clarity as to be understandable"; it need not provide a detailed statement of its reasoning and conclusions. *See also Aguirre-Aguirre,* 526 U.S. at 431-32, 119 S.Ct. 1439; *S. Trenton Residents Against 29 v. Fed. Highway Admin.,* 176 F.3d 658, 666 (3d Cir.1999) (stating that court may uphold agency's " 'decision of less than ideal clarity if the agency's path may reasonably be discerned' ") (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)). Thus, whereas the BIA's decision in the present case may not be a model of exposition, it sufficiently sets forth the BIA's reasoning in a manner that permits a reviewing court to discern the "basis of its decision." *Dominguez v. Ashcroft,* 336 F.3d 678, 680 (8th Cir.2003).

We therefore conclude that because the requirements of both *Abdulai* and *Chenery* are satisfied, Kamara's due process claim must fail. [FN7]

B. *The BIA's Application of the CAT Standard*

**\*8** [12][13] "An applicant for relief on the merits under [Article 3] of the [CAT] bears the burden of establishing 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.' " *Sevoian v. Ashcroft,* 290 F.3d 166, 174-75 (3d Cir.2002) (quoting 8 C.F.R. § 208.16(c)(2)). The standard for relief under the CAT "has no subjective component, but instead requires the alien to establish, by objective evidence, that he is entitled to relief." *Id.* at 175 (internal citations and quotations omitted); *see also Cadet v. Bulger,* 377 F.3d 1173, 1180 (11th Cir.2004); *Elien v. Ashcroft,* 364 F.3d 392, 398 (1st Cir.2004).

[14][15] We have stated that:

> For an act to constitute torture under the [CAT] and the implementing regulations, it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for an illicit or proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

*Auguste v. Ridge,* 395 F.3d 123, 151 (3d Cir.2005); *see also Matter of J-E-,* 23 I. & N. Dec. 291, 297 (BIA 2002) (citing 8 C.F.R. § 208.18(a)); *Cadet,* 377 F.3d at 1192 (outlining same requirements); *Elien,* 364 F.3d at 398 (same). An "alien's testimony, if credible, may be sufficient to sustain the burden of proof without corroboration." *Zubeda,* 333 F.3d at 471 (citing *Mansour v. INS,* 230 F.3d 902, 907 (7th Cir.2000)). "If an alien meets his/her burden of proof, withholding of removal under the [CAT] is mandatory just as it is for withholding of deportation under § 243(h)." *Id.* at 472 (citing INA § 241(b)(3) and 8 C.F.R. §§ 208.16-208.18). [FN8]

[16] The BIA stated the proper legal standard in its opinion. J.A. at 37 ("[T]o demonstrate eligibility for relief pursuant to the [CAT], an alien must prove that he or she more likely than not faces torture."). We take issue, however with its application of the above standard to the undisputed facts of the case.

Under the BIA's application of the CAT regulations, to qualify for relief, Kamara was required to establish either: (1) that there was a greater than 50% probability that he would face torture at the hands of the RUF; *or* (2) that there was a greater than 50% probability that he would face torture at the hands of the Sierra Leone government. The BIA separately considered the likelihood of torture by each entity. Under its analysis, Kamara would be entitled to relief only if he was able to demonstrate by a preponderance of the evidence that at least one of the entities, taken alone, would torture him if he were returned to Sierra Leone.

A proper application of the regulations, however, merely requires Kamara to establish that it is more likely than not that he faces torture by "a public official (government)" in Sierra Leone; *i.e.,* by the RUF *or* the Sierra Leone government, when the two entities are considered together. [FN9] In other words, Kamara is entitled to CAT protection if he is able to demonstrate that the cumulative probability of torture by the two entities exceeds 50%.

**\*9** Thus, for illustrative purposes only, let us assume that the probability of Kamara being returned to RUF controlled territory is 30%, and that the probability of Kamara suffering torture at the hands of the RUF, if returned to RUF controlled territory, is 90%. Assume further that the probability of Kamara being returned to territory controlled by the Sierra Leone government is 70% and the probability of torture if returned to such territory is 40%. The probability that Kamara will be subjected to torture, if returned to Sierra Leone, is the sum of the weighted probability of torture in each of the two territories; in this case 55% (30% multiplied by 90% + 70% multiplied by 40% = 55%). *See* Roger A. Carlson, *Statistics* 12 (Holden-Day, Inc.1973) ("If A and B are mutually exclusive [events], then the probability of A union B [*i.e.,* the event which occurs whenever A or B occurs] must be the *sum* of the probabilities of A and B."). Thus, despite the fact that Kamara cannot demonstrate that it is more likely than not that he will be tortured by the RUF (30% multiplied by 90% = 27%), or by the Sierra Leone government (70% multiplied by 40% = 28%) when each entity is considered independently, under the circumstances assumed above, Kamara may be able to demonstrate that it is more likely than not that he will be tortured if returned to Sierra Leone when the two entities are considered together. [FN10]

The BIA's erroneous application of the regulations is evident in its opinion. The BIA first concluded that because " 'it cannot be found ... more likely than not that [Kamara] would find himself in the RUF's hands,' " J.A. at 37 (quoting IJ opinion), Kamara failed to demonstrate by a preponderance of the evidence that he will be tortured by rebel forces. The Board proceeded as if this aspect of the case was no longer pertinent, stating that "[t]herefore, we decline to address whether the RUF constitutes a government for purposes of the [CAT]." J.A. at 37; *see also* Appellant's Br. at 15 ("No more needed to be said on that front."). The Board then reasoned that Kamara failed to demonstrate by a preponderance of the evidence that he will be tortured by the Sierra Leone government. Because the likelihood of torture by the RUF is less than 50% and the likelihood of torture by the Sierra Leone government is less than 50%, the BIA concluded that the IJ's decision must be reversed.

[17] Properly applying the CAT regulations to the stipulated facts of this case, Kamara may indeed be entitled to relief under the CAT. The IJ concluded that although "it is impossible to speculate with any accuracy the likelihood" of Kamara falling into RUF hands, if such an event should happen, "torture is all but certain." JA. at 28. He further concluded that the chances of Kamara falling into the government hands "is much greater" than his chances of falling into RUF hands, and while "[c]learly not as brutal as the rebels, the government of Sierra Leone nonetheless poses a significant risk of torture for its citizens, depending on who they may be." J.A. at 29. Thus, although any application of the regulations must necessarily be more qualitative than quantitative, *see, e.g., Matter of Acosta,* 19 I & N Dec. 211, 229 (BIA 1985), we conclude that the BIA improperly applied the CAT standards to Kamara's petition for relief. As stated by the IJ, "the very difficulty of proof is further reflection of the instability of the country, which raises, rather than reduces, the likelihood of torture." J.A. at 30.

**\*10** Our above analysis, however, rests on the assumption that the IJ was correct in concluding that the RUF was a "public official" for purposes of 8 C.F.R. § 208.18(a). Neither the CAT regulations, 8 C.F.R. § 208.18, nor the Convention Against Torture, Art I (which § 208.18 incorporates), defines the term "public official." As stated in the IJ's July 12, 2001 written decision, the United Nations Committee Against Torture, which hears and adjudicates certain individual claims arising under Article 3 of the CAT, has held that the rebel group Sendero Luminoso [Shining Path] of Peru was not a "public official" because it was neither the government, nor did it act with the government's acquiescence. J.A. at 25 (*citing Matter of S-V-,* Int. Dec. # 3430 (BIA 2000), slip op. at 8-9). Similarly the BIA has held, as of May 2000, that guerillas in Colombia were not shown to act as, or with the acquiescence of, "public officials" in that country. *Id.*

[18] As noted above, because of its erroneous application of the CAT regulations, the BIA declined to address whether the RUF constitutes a "public official" for purposes of 8 C.F.R. § 208.18. On remand, the BIA is instructed to determine that issue first. If it determines that the RUF should be deemed a "public official," the BIA should then apply the proper CAT analysis explained above to the undisputed facts of the case. [FN11] *See INS v. Ventura,* 537 U.S. 12, 123 S.Ct. 353, 154 L.Ed.2d 272 (2002) (per curiam). [FN12]

C. *The State-Created Danger Exception*

[19] Kamara argues that in addition to misapplying the proper legal standard to his CAT petition the BIA, in issuing its final order of removal, violated his right to substantive due process under the state-created danger exception.

[20][21] The Due Process Clause of the Fourteenth Amendment applies to all " 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis,* 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); *see also Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *Mathews v. Diaz,* 426 U.S. 67, 77, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). In most circumstances, the Due Process Clause imposes no obligation on a state to protect an individual from harm inflicted by private parties. Nonetheless, we have recognized a "state-created danger exception," such that the government has a constitutional duty to protect a person against injuries inflicted by a third-party when it affirmatively places the person in a position of danger the person would not otherwise have faced. Cases predicating constitutional liability on a state-created danger theory have four common elements:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur.

**\*11** *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996) (internal citation and quotations omitted). Furthermore, "the cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury." *Id.* (internal citations and quotations omitted).

We, as well as other appellate courts, have held that the state-created danger theory is a viable mechanism for establishing a constitutional violation under 42 U.S.C. § 1983. *See Kneipp,* 95 F.3d at 1208; *see also Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir.1995); *Reed v. Gardner,* 986 F.2d 1122, 1125 (7th Cir.1993); *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir.1993); *Freeman v. Ferguson,* 911 F.2d 52, 55 (8th Cir.1990). We are aware of no court of appeals which has recognized the constitutional validity of the state-created danger theory in the context of an immigration case. *But see Builes v. Nye,* 239 F.Supp.2d 518 (M.D.Pa.2003) (holding that despite petitioner's inability to establish habeas relief under CAT--because evidence did not support finding that Colombian government would acquiesce to torture by drug cartel--petitioner was entitled to relief under state-created danger exception). We decline to do so here, and hold that the state-created danger exception has no place in our immigration jurisprudence.

The Supreme Court has repeatedly made clear that " 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)); *accord Kleindienst v. Mandel,* 408 U.S. 753, 766, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). "Our cases 'have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.' " *Fiallo,* 430 U.S. at 792, 97 S.Ct. 1473 (quoting *Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). The Court stated in *Galvan v. Press,* 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), that:

> Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government.... We are not prepared to deem ourselves wiser or more sensitive to human rights than our predecessors, especially those who have been most zealous in protecting civil liberties under the Constitution, and must therefore under our constitutional system recognize congressional power in dealing with aliens....

**\*12** *Id.* at 531-32, 74 S.Ct. 737.

To that end, the Court has applied a very lenient "facially legitimate and bona fide reason standard" to constitutional challenges of immigration

statutes. *See, e.g., Fiallo,* 430 U.S. at 795, 97 S.Ct. 1473 (holding that immigration statute that distinguished between "legitimate" and "illegitimate" children of United States citizens in giving preference for immigration status to aliens met equal protection standards because distinctions in statute were based on "facially legitimate and bona fide reason"); *Kleindienst,* 408 U.S. at 769, 92 S.Ct. 2576 (holding that regulation denying applicant visa for communist beliefs passes First Amendment "facially legitimate and bona fide reason" scrutiny).

Extending the state-created danger exception to final orders of removal would impermissibly tread upon the Congress' virtually exclusive domain over immigration, and would unduly expand the contours of our immigration statutes and regulations, including the regulations implementing the CAT. Despite the fact that Congress could reasonably choose to amend the immigration statutes to incorporate novel developments in our case law, "these are policy questions entrusted exclusively to the political branches of our Government, and we have no judicial authority to substitute our political judgment for that of the Congress." *Fiallo,* 430 U.S. at 798, 97 S.Ct. 1473.

D. *Remaining Issues*

1. *New Country Conditions*

According to the 2004 State Department Country Reports on Human Rights Practices, the civil war between the Sierra Leone government and the RUF officially ended in 2002. At present, the government, which has full control of the country, "generally respect[s] the human rights of its citizens...." Country Report, at 1, *available at* www.state.gov/g/drl/rls/hrrpt/2004/41625.htm. The most recent Country Report further notes that the Sierra Leone Constitution prohibits torture and other cruel, inhuman, or degrading treatment or punishment, and states that over the past year there have been relatively few reports of such incidents. *Id.* at 2. The issue thus becomes whether we can take notice of these new country conditions and factor them into our analysis of whether to grant Kamara's petition for review, or rather, whether we must rest our decision on country reports included in the administrative record which, by now, are nearly six years old.

In *Berishaj v. Ashcroft,* 378 F.3d 314 (3d Cir.2004), we directly addressed this issue, and held that while the use of stale country reports is particularly problematic and may lead sometimes to absurd or unjust results, "courts reviewing the determination of an administrative agency must approve or reject the agency's action purely on the basis of the reasons offered by, and the record compiled before, the agency itself." *Id.* at 330 (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)); *see also Gambashidze v. Ashcroft,* 381 F.3d 187, 193-94 (3d Cir.2004). We further noted that while other circuits do take judicial notice of new country developments not reflected in the administrative record, *see, e.g., Pelinkovic v. Ashcroft,* 366 F.3d 532, 540-41 (7th Cir.2004) (taking judicial notice that country conditions for ethnic Albanians in Serbia and Montenegro in 2004 are much improved over conditions in the early 1990s), such an approach "not only carries with it the potential for wholesale relitigation of many immigration-law claims, but the Courts of Appeals are ill-equipped to receive supplementary evidence." *Berishaj,* 378 F.3d at 330.

**\*13** Responding to our concern expressed in *Berishaj,* the Attorney General implemented a new policy, whereby the Office of Immigration Litigation ("OIL") screens and remands petitions for direct review "where records are out of date and not appropriate for judicial review." *Ambartsoumian v. Ashcroft,* 388 F.3d 85, 88 (3d Cir.2004). The factors the OIL uses in assessing the need for remand include: "(1) whether there have been pertinent, intervening events in the country of removal; and (2) whether the issues on review are 'time sensitive' in that changes in conditions over time may affect the resolution of the issues." *Id.*

DHS states that "[t]his case has been screened pursuant to this policy," and it has deemed remand inappropriate. Appellant's Reply Br. at 9. The government, after obtaining a favorable holding from the BIA, had little incentive to pursue remand of the present case to the BIA, even if remand would have introduced evidence more favorable to its case. Kamara, meanwhile, had no incentive to file a motion to reopen, *see* 8 U.S.C. § 1229a(c)(7), 8 C.F.R. § 1003.2, because the updated country reports, if accepted, would all but eviscerate any asylum, withholding, or CAT claim that he asserted. Thus, despite the new policy implemented by the Attorney General, we again are faced with an administrative record which appears woefully outdated. We take this opportunity to remind the Attorney General that the internal remand procedure outlined in *Ambartsoumian* is appropriate not only for cases where country conditions have deteriorated in the area of the world where petitioner seeks review, but also where conditions have so improved that withholding of removal or relief under the CAT cannot be justified. The Court of Appeals should be guarded from adjudicating cases where the underlying issues have largely been mooted by changes in country conditions.

2. *The Scope of the District Court's Injunction*

[22] In light of the unique procedural posture of this case, where the District Court's opinion below has been vacated, we are not obliged to address the Court's issuance of a permanent injunction against removal. Nonetheless, we note that such injunctive orders are overbroad as a matter of law. The regulations governing CAT relief make plain that protection under the CAT may be terminated upon changes in country conditions. *See* 8 C.F.R. § 208.17(d). [FN13] Thus, even if CAT relief is granted, the government is authorized to file a motion to reopen, based on changed country conditions, to terminate an alien's deferral of removal.

IV.

In sum, for the reasons given above, we hold that the BIA improperly applied the CAT regulations. We vacate the District Court's opinion, and remand to the BIA for further proceedings consistent with our opinion UNITED STATES COURT OF APPEALS.

> FN\* Because we have converted the present case into a petition for direct review, we are required to substitute the Attorney General for the current respondent (Department of Homeland Security). 8 U.S.C. § 1252(b)(3)(A).
>
> FN\*\* Hon. Louis H. Pollak, Senior United States District Judge for the Eastern District of Pennsylvania, sitting by designation.
>
> FN1. The stipulation provided that the facts relating to Kamara's habeas petition are not in dispute, and that the issue before the District Court was purely legal.
>
> FN2. The CAT refers to the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub.L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231).
>
> FN3. Kamara also filed a motion for emergency stay of removal, which the District Court elected to treat as a petition for writ of habeas corpus, and by order dated May 30, 2002, consolidated the actions. On July 25, 2002, the District Court issued an Order stating that it lacked jurisdiction to consider the habeas petition. On appeal, this court issued a judgment vacating the District Court's July 25, 2002 Order and remanding the case, in light of our decision in *Ogbudimkpa v. Ashcroft,* 342 F.3d 207, 222 (3d Cir.2003) (holding that district courts have jurisdiction

under 28 U.S.C. § 2241 to review CAT claims for "errors of law, including the erroneous application or interpretation of statutes") (internal citations and quotations omitted).

FN4. 8 U.S.C. § 1252(e) allows for very limited habeas review in expedited removal cases brought under 8 U.S.C. § 1225(b).

FN5. Indeed, if the REAL ID Act imposed a narrower standard of review than that previously offered under a petition for habeas corpus, a significant Suspension Clause issue would arise.

FN6. Indeed, in a section of the IJ's opinion devoted solely to a discussion of Kamara's CAT petition, the IJ stated that "it is impossible to speculate with any accuracy the likelihood of RUF's gaining control of enough of Sierra Leone to make [Kamara] fall into its hands...." J.A. at 28.

FN7. Kamara's reliance on *Zubeda v. Ashcroft,* 333 F.3d 463 (3d Cir.2003), is misplaced. In *Zubeda,* we vacated and remanded the BIA's decision denying petitioner relief under the CAT, noting that the BIA's "rather terse" decision provided only a "minimal analysis" of petitioner's claim. *Id.* at 475-79. *Zubeda,* however involved a direct petition for review, where we examined the BIA's decision under the substantial evidence standard. *Id.* at 471. By contrast, our review is much narrower in the present case. *See* REAL I.D. Act § 106(a)(1)(A)(iii). Furthermore, although noting the terseness of the BIA's opinion, we were primarily concerned that the BIA had allowed "the taint of the [IJ's] earlier adverse credibility determination" regarding Zubeda's asylum claim to "bleed through to the BIA's consideration of her [CAT] claim." *Id.* at 476. No such concern is implicated here.

FN8. 8 C.F.R. § 208.16(c)(3) provides that: In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of future torture shall be considered, including, but not limited to:
(i) Evidence of past torture inflicted upon the applicant;
(ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
(iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
(iv) Other relevant information regarding conditions in the country of removal.

FN9. 8 C.F.R. 1208.16(c)(3)(ii) provides in pertinent part that: "In assessing whether it is more likely than not that an applicant would be tortured in the proposed country of removal, all evidence relevant to the possibility of torture shall be considered, including, but not limited to: ... (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured."

FN10. The above analysis, of course, assumes that Kamara falling into the hands of the RUF, and Kamara falling into the hands of the Sierra Leone government are mutually exclusive events. They may not be. There does exist a probability greater than zero (however slight) that Kamara could find himself in territory controlled by one entity and then, at a later time, find himself in a territory controlled by the other.
Assume that Kamara has a 20% probability of falling into RUF hands alone and a 90% probability of torture if such an event occurs. Assume furthermore that Kamara has a 70% chance of falling into the hands of the Sierra Leone Government alone, and a 40% chance of torture if such an event occurs. Finally assume that there is a 10% probability that Kamara will fall into the hands of both the RUF and the Sierra Leone Government. The chance of torture by either, or both, entities if such an event occurs is (100%--(the probability that he will not be tortured by either entity)), or (100%--(10% * 60%)) = 94%.
Thus the overall probability of torture if Kamara is returned to Sierra Leone is equal to (the weighted probability of Kamara being tortured by the RUF, if he finds himself only in RUF territories) + (the weighted probability of Kamara being tortured by the Sierra Leone Government, if he finds himself only in Government controlled territories) + (the weighted probability of Kamara being tortured by either, or both, the RUF and the Sierra Leone Government if Kamara finds himself in both RUF and Government territories). Applying our hypothetical to this equation, yields an overall probability of torture of (20% * 90%) + (70% * 40%) + (10% *94%) = 55.4%.

FN11. The intervening passage of the REAL ID Act relieves us of resolving the unsettled issue of whether remand is appropriate when granting an alien's habeas corpus petition.
In contrast to the pre-IIRIRA statutory regime (allowing for direct review of a final order of deportation against an alien who is removable by reason of committing a criminal offense), which bestowed upon the courts "the broad authority to grant declaratory and injunctive relief," *INS v. St. Cyr,* 533 U.S. 289, 309, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), under the post-IIRIRA (but pre-REAL ID) scheme for criminal aliens, "the limited role played by the [habeas] courts" is "far narrower than the judicial review authorized by [the old statutory structure]." *Id.* at 312, 121 S.Ct. 2271.
The writ of habeas corpus "performs a precise and specific function: it forces the government to justify a decision to hold an individual in custody." *Zalawadia v. Ashcroft,* 371 F.3d 292, 299 (5th Cir.2004); *see also Zadvydas v. Davis,* 533 U.S. 678, 699, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (stating that "the historic purpose of the writ [is] to relieve detention by executive authorities without judicial trial ...") (internal citation and quotations omitted); *Heflin v. United States,* 358 U.S. 415, 421, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959) (Stewart, J., concurring) ("The very office of the Great Writ, its only function, is to inquire into the legality of the detention of one in custody."). This singular focus on the legality of detention not only constrains the scope of a habeas court's review, but also the nature of relief that a habeas court may provide.
As stated in *Allen v. McCurry,* 449 U.S. 90, 98 n. 12, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), a case not involving an alien habeas petition, the "unique purpose of habeas corpus" is "to release the applicant for the writ from unlawful confinement." Thus, a habeas court may lack the authority to remand a case to the BIA for further proceedings. *Cf. Herrera v. Collins,* 506 U.S. 390, 403, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("The typical relief granted in federal habeas corpus is a conditional order of release unless the State elects to retry the successful habeas petitioner...."). At least one court of appeals that has examined the issue has found that remand is not appropriate. *See Zalawadia,* 371 F.3d at 298.
Were we still faced with the DHS' appeal of the District Court's opinion granting Kamara's habeas petition, we may have simply vacated the order of removal without remand. Given our conversion of the present habeas case into a petition for direct review, however, remand is now appropriate.

FN12. We emphasize, once again, that our above

characterization of the likelihood of torture using numerical hypotheticals is for illustrative purposes only. On remand, the BIA should apply the overarching principles (which we have chosen to demonstrate quantitatively), in a qualitative manner.

FN13. 8 C.F.R. § 208.17(a) provides that:
An alien who: has been ordered removed; has been found under § 208.16(c)(3) to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal under § 208.16(d)(2) or (d)(3), shall be granted deferral of removal to the country where he or she is more likely than not to be tortured.
§ 208.17(d)(1) provides however that:
At any time while deferral of removal is in effect, the INS District Counsel for the District with jurisdiction over an alien whose removal has been deferred under paragraph (a) of this section may file a motion with the Immigration Court having administrative control pursuant to § 3.11 of this chapter to schedule a hearing to consider whether deferral of removal should be terminated.
After new evidence is presented, 8 C.F.R. § 208.17(d)(4) establishes that:
If the immigration judge determines that the alien is more likely than not to be tortured in the country to which removal has been deferred, the order of deferral shall remain in place. If the immigration judge determines that the alien has not established that he or she is more likely than not to be tortured in the country to which removal has been deferred, the deferral of removal shall be terminated and the alien may be removed to that country.

--- F.3d ----, 2005 WL 2063873 (3rd Cir.(Pa.))

Briefs and Other Related Documents (Back to top)

. 04-2647 (Docket)
 (Jun. 14, 2004)

END OF DOCUMENT